#30909, #30925-a-SPM
**2025 S.D. 57**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JANELLE PEERY,                                         Plaintiff and Appellant,

    v.

CURTIS PEERY,                                         Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
LINCOLN COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE RACHEL R. RASMUSSEN
Judge

* * * *

MICHAEL F. TOBIN
KRISTIN N. DERENGE of
Boyce Law Firm, L.L.P.
Sioux Falls, South Dakota               Attorneys for plaintiff and
appellant.


MEREDITH A. MOORE of
Cutler Law Firm, L.L.P.
Sioux Falls, South Dakota               Attorneys for defendant and
appellee.

* * * *

CONSIDERED ON BRIEFS
AUGUST 26, 2025
OPINION FILED **10/29/25**

MYREN, Justice

[¶1.]        Curtis Peery and Janelle Rabenberg were divorced in 2019.  Under the terms of their divorce, Curtis was required to make monthly alimony payments to Janelle.  In 2023, Curtis relocated to Texas, and his income decreased significantly.  He failed to make three alimony payments and filed a motion requesting that his alimony obligation be modified.  Janelle filed a motion for contempt relating to Curtis's failure to make alimony payments as required by the 2019 divorce decree.  The circuit court granted Curtis's motion to modify, denied Janelle's motion for contempt, and declined Curtis's request to apply its alimony modification retroactively to past-due amounts.  We affirm.

## Factual and Procedural Background

[¶2.]        Curtis and Janelle were married in 1994.  After their marriage, Janelle worked as a dental hygienist while Curtis completed medical school.  After medical school, Curtis completed a five-year medical residency in general surgery in Sioux Falls.  After Curtis finished his residency in Sioux Falls, the couple moved to Des Moines, where Curtis worked as a faculty member at a residency program, and Janelle continued to work as a dental hygienist.  After two years in Des Moines, the couple moved back to Sioux Falls, where Curtis began working at Sanford USD Medical Center as a bariatric surgeon.  In addition to his work at Sanford, Curtis worked independently as a consultant.

[¶3.]        The couple had four children together.  Before the birth of their third child, they agreed that Janelle would no longer work as a dental hygienist and would instead stay home to care for their children and the home.  Janelle testified

that her dental hygiene license has since lapsed, and if she were to return to that line of work, she would need to retake dental hygiene courses.

[¶4.] In 2019, Janelle initiated divorce proceedings against Curtis, and the couple reached an agreement regarding the terms of the divorce. The circuit court entered a judgment and decree of divorce consistent with the terms of the parties' agreement (2019 decree). Relevant here, the agreement obligated Curtis to make alimony payments to Janelle:

> It is hereby agreed, Curtis shall continue to pay Janelle, $19,250.00 until such time as the home sells. Both parties recognize this is a combined payment of alimony and support payments for the children, including a consideration for Janelle paying expenses, rent, and allowances for adult children. Janelle will continue to pay the expenses as she was per the Interim Agreement until the home s[ells].

> Upon the sale of the home, Curtis shall pay to Janelle, an alimony payment of Thirteen Thousand Five Hundred Dollars ($13,500.00) per month commencing the first of the month following the sale of the home. This alimony shall continue for a period of six (6) years, at which time the alimony shall be reduced to Seven Thousand Dollars ($7,000.00) per month for a period of nine (9) years. These payments shall be through an automatic deposit into Janelle's account. In addition, Curtis shall pay an additional Five Hundred Dollars ($500.00) per month into a Roth IRA of Janelle's choosing for a period of ten (10) years.

In January 2020, the marital home sold, and Curtis's alimony obligation was reduced to $13,500 a month.

[¶5.] From 2019 to 2022, Curtis maintained his employment at Sanford and continued engaging in independent consulting. In 2021, he earned an adjusted gross income of $833,932, which included $720,000 from Sanford and $118,000 from independent consulting work. In 2022, Curtis earned an adjusted gross income of

$872,402, which included $787,788 from Sanford and $88,500 from his independent consulting work.

[¶6.]        In 2023, Curtis left his employment at Sanford and moved to Texas. He testified that in the years leading up to his departure, he felt that Sanford did not fully understand or appreciate the nature of his practice, which made it difficult for him to grow professionally. He also explained that his mental health was suffering in Sioux Falls. Because he had family in Texas, he thought that moving would improve his personal life. Before moving, Curtis reached out to several private practices and hospitals inquiring about potential employment opportunities. Curtis joined Bariatric Experts, a private bariatric surgery practice, as a contract physician. Curtis explained that he was presented with a prospectus indicating that he could potentially earn more money after his first year with that practice than he had been earning at Sanford.

[¶7.]        Curtis's employment with Bariatric Experts did not prove as lucrative as he had hoped. In 2023, Curtis's adjusted gross income was $575,545, consisting of $420,000 from Bariatric Experts and the remainder from consulting work. He testified that the practice would not advertise that he had joined the practice, would not allow him to conduct as much consulting work as he wanted, and would not allow him to perform general surgeries. In December 2023, Curtis left Bariatric Experts.

[¶8.]        Curtis then joined a different private practice, Inspire Bariatrics. Pursuant to his agreement with this practice, he shared the monthly overhead expenses with another physician. His monthly share was approximately $22,000.

He could not share in any profits generated by the other physician. Curtis did not generate any profit in his first year with Inspire Bariatrics, but he testified that he is hopeful that his practice will pick up in the future.

[¶9.] After joining Inspire Bariatrics, Curtis struggled to meet his financial obligations. Curtis took out a $200,000 line of credit, borrowed against a $100,000 life insurance policy in his name, and reduced his living expenses to alleviate these pressures. Curtis testified that he was still unable to make the $13,500 monthly alimony payment to Janelle despite these efforts.

[¶10.] In June 2024, Curtis filed a motion to modify his alimony obligation, seeking "a reduction in the amount and term of his alimony payments, which request results from a change in his employment and reduction in his income." The motion averred that Curtis "is unable to continue to make alimony payments in the amounts provided and for the specified term set forth in the Stipulation." On July 2, 2024, Curtis filed a notice of hearing related to his motion to modify his alimony obligation. In July 2024, Curtis failed to make the $13,500 monthly alimony payment to Janelle. In August and September 2024, Curtis only sent Janelle $3,500 in alimony. In response, Janelle filed a motion for contempt in September 2024.

[¶11.] Ahead of the hearing on the parties' respective motions, they submitted briefs, affidavits, and detailed financial documentation. Curtis and Janelle each testified. Curtis explained that he did not move to Texas with the intention of becoming underemployed or earning less; instead, he believed the move would be profitable, but it did not work out as planned. He explained that he hopes

his income will soon increase after his practice becomes more established. He testified about his financial condition and how it affected his ability to comply with his alimony obligations. Janelle testified that her standard of living had remained the same as it was before the divorce. She also explained that she had no intention of seeking employment and that alimony was her primary source of income.

[¶12.]        After the hearing, the circuit court granted Curtis's motion to modify his alimony obligation and denied Janelle's motion for contempt. Regarding alimony, the circuit court found that Curtis's testimony was credible:

> [Curtis's] testimony regarding his employment struggles and current financial condition is credible and supported by the evidence. [Curtis's] relocation and change in employment was not an attempt to become under- or unemployed, nor did he intentionally reduce his income or earning capacity. It appears [Curtis] was not trying to get out of a "bad bargain" of alimony, but that he made a "bad business decision," and that this decision was not intentional or that he sabotaged the business opportunity.

Regarding Janelle's financial needs, the circuit court found as follows:

> While [Janelle's] testimony supports her desire to maintain her current lifestyle, her testimony and submitted evidence do not support a credible claim of necessity. The Court does not analyze what the Plaintiff has done with her prior alimony payments, but it looks to her current claim of necessity considering [Curtis's] change in ability to pay. In this light, [Janelle's] budget includes items she pays for or believes are necessary for her adult children, such as a country club membership and cell phone expense that adult children can pay for themselves rather than be part of the Plaintiff's budget necessities. Other expenses are not realistic necessity amounts for a household that now consists of just [Janelle] and one minor child, e.g., $2,850 in clothing and personal care, and $2,900 in groceries, door dash, and entertainment expense per month.

Based on these findings and conclusions, the circuit court reduced Curtis's alimony obligation from $13,500 per month to $6,000 per month, effective January 1, 2025. The circuit court did not change the duration of Curtis's alimony obligation.

[¶13.]     The circuit court denied Janelle's motion for contempt, finding that Curtis's "claim of reduced income is supported by the evidence presented.  Further, the reduction in his income was not willful or contumacious."

[¶14.]     After the circuit court issued its memorandum decision, the parties requested another hearing for clarification about how much alimony would be due from July to December 2024.  The circuit court explained: "The alimony award is modified to begin payment of 6000 per month as of January 1st [2025], and so [Curtis] is still responsible to be paying everything just the same, and then it changes as of January 1st.  I did not want to backdate it because I believe that would put [Janelle] in a very difficult position, and I believe that she should have time to get all of those things figured out as well."

[¶15.]     By notice of appeal, Janelle raises two issues: (1) Whether the circuit court abused its discretion when it granted the motion to modify Curtis's alimony obligation; and (2) Whether the circuit court clearly erred when it denied the motion for contempt.  By notice of review, Curtis raises a third issue: (3) Whether the circuit court abused its discretion when it refused to apply the effective date of the alimony modification retroactively.

**Decision**

> ## 1. Whether the circuit court abused its discretion when it granted the motion to modify Curtis's alimony obligation.

[¶16.] "We review alimony determinations under the abuse of discretion standard." *Leedom v. Leedom*, 2020 S.D. 40, ¶ 11, 947 N.W.2d 143, 147 (quoting *Haanen v. Haanen*, 2009 S.D. 60, ¶ 12, 769 N.W.2d 836, 841). "A circuit court's decision regarding whether to modify an alimony award is also reviewed for abuse of discretion." *Id.* (citing *Barton v. Barton*, 2012 S.D. 44, ¶ 9, 815 N.W.2d 553, 557). The circuit court's factual findings are reviewed for clear error, and its conclusions of law are reviewed de novo. *Id.*

[¶17.] To be entitled to a modification of an alimony obligation, the party seeking the modification must prove there has been a change of circumstances since the time of the divorce. *Horton v. Horton*, 503 N.W.2d 248, 252 (S.D. 1993). The change need not be substantial; "there must merely be a change of circumstances from the circumstances which existed at the time of the original decree." *Id.* (citing *Paradeis v. Paradeis*, 461 N.W.2d 135, 137 (S.D. 1990)).

[¶18.] "The change in circumstances refers to a change in the *necessities* of the recipient and the *financial ability* of the obligor." *Leedom*, 2020 S.D. 40, ¶ 20, 947 N.W.2d at 149 (quoting *Barton*, 2012 S.D. 44, ¶ 15, 815 N.W.2d at 558). "The [circuit] court is not to reflect on whether the decree was 'equitable' when entered, but only whether the economic circumstances of the parties have changed since the award such that the original award is now either insufficient or excessive." *Moore v. Moore*, 2009 S.D. 16, ¶ 12, 763 N.W.2d 536, 540 (quoting *Olson v. Olson*, 1996

S.D. 90, ¶ 11, 552 N.W.2d 396, 399–400). "The role of [circuit] courts in modification proceedings is not to relieve a party of his or her bad bargain." *Id.* (citation omitted).

> This Court has also considered other factors when evaluating a change in circumstances, such as the intentional reduction of gross income; an inquiry into earning potential when a party is under- or unemployed; the intentional inflation of expenses; and the offsetting effect of cohabitation on expenses. Just as courts must be wary of an alimony obligor's efforts to minimize his or her ability to pay through under- or unemployment, courts must also consider conduct by the alimony recipient to maximize his or her unmet needs through speculative expenses and the minimization of support provided by their live-in cohabitants.

*Leedom*, 2020 S.D. 40, ¶ 21, 947 N.W.2d at 149 (internal quotations and citations omitted).

[¶19.] At the hearing on the parties' motions, Curtis presented detailed documentation and testimony regarding his financial condition since he moved to Texas. Based on this evidence, the circuit court found that Curtis's income had decreased significantly since the divorce and that he was unable to pay alimony in accordance with the 2019 decree. This finding is supported by evidence and is not clearly erroneous. The circuit court also found that Curtis credibly testified that although his income had reduced, this reduction was not an attempt to escape his alimony obligation nor was it a reduction made in bad faith. *See Haanen*, 2009 S.D. 60, ¶ 5, 769 N.W.2d at 839 ("We defer to the trial court's judgment on 'the credibility of the witnesses' and the weight to attribute to their testimony." (citation omitted)); *Straub v. Straub*, 381 N.W.2d 260, 261 (S.D. 1986) (explaining that "[t]here is a vast difference [ ] between a disinclination or unwillingness to pay alimony and an inability to pay"). This finding is supported by the testimony that Curtis has sought

additional work through other hospitals to supplement his income and has also reduced his living expenses.

[¶20.]        Janelle submitted a monthly budget for the circuit court's review. Among Janelle's monthly expenditures were $1,712 in country club dues, $2,078 in "Groceries, food, [and] door dash[,]" $830 in "Entertainment, Lyft, [and] restaurants[,]" $1,526 in "Clothing, shoes[,] etc.[,]" and $1,323 in "Personal care." The circuit court determined that these were not "realistic necessity amounts for a household that now consists of just [Janelle] and one minor child[.]"  The circuit court found that Janelle's "testimony and submitted evidence do not support a credible claim of necessity."  The circuit court's credibility assessment is entitled to deference.  In making its finding, the circuit court noted that Janelle was only caring for herself and one of their children.[1]

[¶21.]        Additionally, the circuit court considered Janelle's testimony that some of her monthly expenses were attributable to their adult children, including "a country club membership and cell phone expense[.]"  In effect, the circuit court reasoned that these expenses were inflating her monthly budget.  While the 2019 decree contemplated that the alimony provision included "an amount for Janelle to provide for the children when they are in her home with her," it specifically explained that "[Janelle] shall not be required to pay for any specific expenses for the adult children[.]"

---

1.      Janelle testified that their youngest daughter was a senior in high school at the time of the hearing and was expected to graduate from high school in May 2025 and attend college in the fall.

[¶22.] The circuit court's finding regarding Janelle's financial necessities was dependent on its determination that Janelle's assertions were not credible. The circuit court was oriented to Janelle's living situation and made its findings based on the documentation submitted and Janelle's testimony. The circuit court's findings are not clearly erroneous.

[¶23.] The circuit court was presented with detailed documentation of the parties' respective financial conditions and received testimony regarding their current lifestyles. The circuit court's factual findings related to Curtis's motion to modify his alimony obligation are supported by the evidence in the record and are not clearly erroneous. In light of the circuit court's factual findings, its decision to modify Curtis's alimony obligation was a decision within the reasonable range of permissible decisions and was not an abuse of discretion.

### 2. *Whether the circuit court clearly erred when it denied Janelle's motion for contempt.*

[¶24.] "We review a [circuit] court's findings as to contempt under a clearly erroneous standard." *Love's Travel Stops & Country Stores, Inc. v. City of Wall*, 2023 S.D. 68, ¶ 16, 1 N.W.3d 664, 670 (quoting *Taylor v. Taylor*, 2019 S.D. 27, ¶ 15, 928 N.W.2d 458, 465). "The test is whether after reviewing the evidence we are left with a definite and firm conviction that a mistake has been made." *Brewer v. Tectum Holdings, Inc.*, 2025 S.D. 23, ¶ 51, 20 N.W.3d 433, 445 (quoting *Hughes v. Dakota Mill & Grain, Inc.*, 2021 S.D. 31, ¶ 12, 959 N.W.2d 903, 907).

[¶25.] "A party seeking civil contempt must prove four elements: '(1) the existence of an order; (2) knowledge of the order; (3) ability to comply with the order; and (4) willful or contumacious disobedience of the order.'" *Love's*, 2023 S.D.

68, ¶ 17, 1 N.W.3d at 670 (quoting *Hiller v. Hiller*, 2018 S.D. 74, ¶ 20, 919 N.W.2d 548, 554). "The purpose of the civil contempt is 'to force a party "to comply with orders and decrees issued by a court in a civil action[.]"'" *Id.* (alteration in original) (quoting *Taylor*, 2019 S.D. 27, ¶ 39, 928 N.W.2d at 470–71).

[¶26.]     The parties do not dispute that the first two elements are satisfied; instead, they disagree about the last two—whether Curtis had the ability to comply and whether he willfully or contumaciously failed to comply.

[¶27.]     "When a party raises the inability to pay as a defense in a civil contempt proceeding, that party has the burden of proving her inability to comply with the court's order." *Mundlein v. Mundlein*, 2004 S.D. 25, ¶ 8, 676 N.W.2d 819, 822 (citing *Taecker v. Taecker*, 527 N.W.2d 295, 298 (S.D. 1995)); *see also Sazama v. State ex rel. Muilenberg*, 2007 S.D. 17, ¶ 20, 729 N.W.2d 335, 343. To satisfy this burden, the party claiming the inability must provide "a complete and detailed financial position statement for the court's review." *Taylor*, 2019 S.D. 27, ¶ 40, 928 N.W.2d at 471 (citation omitted).

[¶28.]     The circuit court denied Janelle's motion because it found that Curtis was unable to comply with the 2019 decree. As above, the circuit court based this finding on the financial documentation submitted by Curtis and from his testimony at the hearing. The financial documentation corroborated Curtis's testimony that since his move to Texas, his income had decreased significantly and he had been unable to satisfy his financial obligations, including alimony. Additionally, Curtis testified about his efforts to meet his financial obligations despite his reduced income. He took out a line of credit, borrowed against his life insurance, and moved

into a one-bedroom apartment. The circuit court's finding that Curtis was unable to comply with the 2019 decree is not clearly erroneous.[2] Moreover, it was not until his financial situation had worsened to the point that he could no longer comply that he failed to make payments. Against this backdrop, the circuit court did not clearly err when it found that Curtis did not willfully or contumaciously violate his alimony obligation.

### 3. Whether the circuit court abused its discretion when it refused to apply the effective date of the alimony modification retroactively.

[¶29.]     The decision to retroactively apply an alimony modification to past-due payments is reviewed for abuse of discretion. *Jopling v. Jopling*, 526 N.W.2d 712, 717 (S.D. 1995). "An abuse of discretion is 'a fundamental error of judgment, a

---

2.     In light of the evidence in the record that Curtis—after a significant income reduction of almost $575,000—borrowed around $300,000 and significantly reduced his living expenses in an attempt to fulfill his alimony obligations, the circuit court committed no clear error in determining Curtis was unable to comply with the 2019 decree. Despite the lack of clear error, we note that the circuit court was incorrect in its conclusion that it could not consider Curtis's accumulated assets when determining his ability to pay for contempt purposes. Circuit courts routinely consider assets other than income to determine an individual's ability to pay in the child support context. The circuit court should similarly consider the contemnor's complete financial condition, which includes assets, holdings, and the ability of the contemnor to borrow funds, in contempt proceedings. *See* SDCL 25-7-6.5 ("If a child's needs are not being met through the income of the parents, *assets shall be considered*." (emphasis added)); *Johnson v. Johnson*, 451 N.W.2d 293, 295 (S.D. 1990) (affirming the circuit court's finding that father had the ability to pay despite a lack of income because, among other factors, he "did not attempt to borrow any money to pay his child support obligations"); *Taylor*, 2019 S.D. 27, ¶ 42, 928 N.W.2d at 471 (considering life insurance proceeds in contempt proceedings when assessing ability to pay). But here, based on our review of the financial documentation in the record, the testimony of the parties, and arguments of counsel, we do not conclude the circuit court clearly erred in its findings.

choice outside the reasonable range of permissible choices, a decision . . . [that], on full consideration, is arbitrary or unreasonable.'" *Coester v. Waubay Twp.*, 2018 S.D. 24, ¶ 7, 909 N.W.2d 709, 711 (alteration in original) (citation omitted).

[¶30.]     SDCL 25-7-7.3 prohibits retroactive modifications of past due support payments unless the payment obligation arises after a petition for modification has been filed and a notice of hearing has been served on "the obligee, the obligor, and any other parties having an interest in such matter." In *Culhane v. Michels*, this Court interpreted a prior version of SDCL 25-7-7.3 to cover past-due alimony payments. 2000 S.D. 101, ¶ 13, 615 N.W.2d 580, 585. In its entirety, SDCL 25-7-7.3 provides:

> Any previously ordered support payments that have become due, whether paid or unpaid, are not subject to modification by a court or administrative entity of this state, except those accruing in any period in which there is pending a petition for modification of the support obligation, but only from the date that notice of hearing of the petition has been given to the obligee, the obligor, and any other parties having an interest in such matter.

[¶31.]     Curtis filed his motion to modify his alimony obligations on June 6, 2024. He served Janelle with a notice of hearing related to this motion on July 2, 2024. Under SDCL 25-7-7.3, the circuit court could retroactively modify payment obligations accruing after July 2, 2024. The circuit court opted to maintain the status quo and did not retroactively modify any alimony obligations. The circuit court's rationale was that Janelle should have the opportunity to adjust her expenses to prepare for her reduced alimony income. This decision was within the reasonable range of permissible choices and was not an abuse of discretion.

[¶32.]     We affirm.

[¶33.]        JENSEN, Chief Justice, and KERN and DEVANEY, Justices, concur.

[¶34.]        SALTER, Justice, concurs specially.

SALTER, Justice (concurring specially).

[¶35.]        I agree that we should affirm the circuit court's decision to grant Curtis's motion to modify his alimony obligation, but I think it is important to understand his reduction in income within the broader principles underlying general alimony. I write separately to respectfully add my views.

[¶36.]        Strictly speaking, Curtis's reduction in income was unquestionably voluntary. When he decided to begin working at Inspire Bariatrics, he was starting his own practice in what he described as a competitive medical provider market. Curtis knew he likely would not make any money for at least a year while, at the same time, undertaking a monthly overhead payment of $22,000, in addition to his existing $13,500 alimony obligation. By doing so, Curtis surely understood that he was compromising his ability to pay alimony.

[¶37.]        But the obligation to pay alimony is not an unyielding absolute duty to maintain a former spouse's standard of living. If it were, the established legal standard for modification could not be justified, and alimony awards would simply be enforced as prior judicial orders or perhaps even under contract principles where, as here, divorced spouses agreed to a particular amount of support. Instead, a general alimony award, where it is authorized, exists as a remnant of a spouse's obligation to provide support. *See* SDCL 25-7-1 to -5 (addressing a spouse's duty to support); *see also Haanen v. Haanen*, 2009 S.D. 60, ¶ 18, 769 N.W.2d 836, 842

("[T]he purpose of alimony is an allowance for support and maintenance[.]" (citation modified)).

[¶38.] Viewed in this way, the duty to support through alimony bears a close relationship to the duty that would have existed had the parties remained married. *See* 27B C.J.S. Divorce § 505, Westlaw (database updated May 2025) ("The generally accepted view is that the function of [post-decree] alimony is to provide support to the spouse, that it is a substitute for the spouse's marital right to support, and that it is founded on the legal or marital obligation of one spouse to support the other." (footnotes and citations omitted)). Indeed, this concept lies at the heart of the view that a former spouse's remarriage can end an obligor spouse's duty to pay alimony under the theory that the former spouse's duty of support is replaced by that of the new spouse. *See Marquardt v. Marquardt*, 396 N.W.2d 753, 754 (S.D. 1986) ("Proof that the spouse receiving spousal support payments has remarried establishes a *prima facie* case requiring the court to terminate the support payments unless there are extraordinary circumstances which justify continuance of the payments." (citing *Bauer v. Bauer*, 356 N.W.2d 897, 898 (N.D. 1984))).

[¶39.] For this reason, our cases correctly focus a court's inquiry on intent, not simply the fact that an obligor reduced his income, even intentionally or voluntarily. Therefore, where an obligor attempts to avoid his or her alimony obligation by purposefully reducing income, a court may deny the obligor's motion to modify the obligation. *Moore v. Moore*, 2009 S.D. 16, ¶ 36, 763 N.W.2d 536, 545.

[¶40.]        Here, the circuit court determined that Curtis did not leave Sanford in an effort to avoid his alimony obligation.  Instead, the court found credible Curtis's testimony that he left to improve his mental health and have greater autonomy as a practicing physician.  Under these circumstances, his voluntary reduction in income can properly serve as a basis to modify his support obligation.